THE PEOPLE OF PUERTO RICO, Plaintiff and Appellee, *v.*
FRANCISCO BONILLA, Defendant and Appellant.

No. 9635.   Argued November 20, 1942.—Decided November 30, 1942.

Domingo Candelario for appellant.   *M. Rodríguez Ramos, Acting
Attorney General (George A. Malcolm, former Attorney General,
in the brief), R. A. Gómez, Prosecuting Attorney (Fiscal), Luis
Negrón Fernández, Assistant Prosecuting Attorney,* for the People,
appellee.

MR. JUSTICE TODD, JR., delivered the opinion of the court.

Francisco Bonilla has appealed from the sentence of one
year in jail which the District Court of Ponce imposed upon
him for a crime of petit larceny.   After the evidence for the
People was in, the defendant filed a motion of nonsuit which
was dismissed and, since the defendant did not submit any
evidence in his favor, the court entered the above-mentioned
judgment.   By the second assignment of error the defendant
insisted on the motion of nonsuit and, therefore, we shall
limit ourselves to examining the evidence submitted at the
trial, for if there is merit in appellant's contention, we would
have to reverse the judgment.

We have read the transcript of the evidence and we are
of the opinion that the summary which the prosecuting at-
torney of this court made in his brief, with respect to the
circumstantial evidence that tends to connect the defendant
with the crime with which he was charged substantially agrees
with the testimony of the witnesses.   Said summary reads
as follows:

". . . Doña Nicolasa Vélez was living completely alone in a small house at ward (*barrio*) Vegas Arribas of Adjuntas. Defendant Bonilla knew her and knew that she lived alone. Every time that he met her he used to ask her if she 'had money.' On the night of June 25, 1942, Doña Nicolasa was at her son's house where a card game was taking place. She had gone there and in view of the fact that her daughter-in-law was sick she had to remain. Defendant arrived there accompanied by witness Moll. About midnight, Doña Nicolasa, at her son's suggestion, prepared some coffee. The defendant had a cup of coffee and in the presence of Doña Nicolasa he reclined or threw himself over some cases that were there and said to her: 'Doña Nicolasa, do you have much money,'' and immediately asked her if she slept alone in her house. At about three o'clock in the morning, the people started to leave and defendant's father invited him to accompany him to his house, but the defendant told him that he would go there in the morning because he was not going into town. The defendant asked Doña Nicolasa's son for two candles and a box of matches and left the house together with witness Moll and another man called Esteban Ortiz. They went away together, and before going by Doña Nicolasa's house, Esteban Ortiz stayed in his house. Moll and the defendant went on and while they were going by the woman's house, the defendant said: 'Doña Nicolasa must have some money in there.' He kept on walking with Moll for about two hectometers and then he told Moll that he, the accused, would go to a shanty owned by Don Andrés González to sleep because he had no place to sleep in town. Moll continued on in the direction of the town and the defendant went back. While they were walking from the house where they had been playing cards towards the town, no other persons followed them and everything was quiet. That night, Doña Nicolasa's house was closed, but someone went into the house by forcing the lock of the door, and some golden jewels, one-half dozen dresses, a cotton dress, a can of pears, another can of peaches, and some money in silver which Doña Nicolasa had collected to pay for a rosary disappeared from there. A bottle of kerosene which had been on a shelf appeared spread all over the floor. The next morning between seven and eight o'clock, the defendant visited witness Moll, his companion of the night before, and gave him the news that someone had entered Doña Nicolasa's house and asked him, if he should be questioned as to where he (the defendant) had slept, to say that he had slept in his house

(Moll's). They were together until about midnight and later on they went out into the street.

"About a week later, Doña Nicolasa was visited by an uncle of the defendant and . . . he asked her to go and see the defendant's mother because she wanted to see her. When she went to see the mother, the latter burst into tears while saying that her only capital consisted of two small cows. She offered to give one of them to Doña Nicolasa to repay her for what her son (the defendant) had done to her."

The only elements of this evidence which may be held to connect the accused with the crime charged are the following:

1. The questions put to the complainant by the defendant before and on the night in which the larceny occurred, with respect to whether or not she had money.

2. The statements made to witness Moll, while going by the complainant's house, that "Doña Nicolasa must have some money in there," and the fact that he said that he would go to sleep in a shanty because he had no place to sleep in town; and

3. The defendant's conduct on the following day when he went to see Moll and, after informing him that someone had entered Doña Nicolasa's house, asked him to say, if he should be asked, that he had slept in his house (Moll's).

We say that this is the only evidence which tends to connect the defendant with the crime charged because the posterior demeanor of his uncle and his mother with relation to the offering of a cow to the complainant may not tend to incriminate him, since it was not proved that the defendant intervened or was present when that occurred. The lower court itself eliminated this part of the evidence in entering judgment. (Tr. of Ev., p. 24.)

We are of the opinion that the circumstantial evidence submitted in this case is not sufficient to sustain his conviction. That Bonilla should have asked the complainant whether or not she had any money, that he should have told Moll that she had it in the house, coupled with the fact that he

had said to Moll on the following day that the house had been penetrated and that he should say that he, the defendant, had slept in his house (Moll's), are circumstances which tend to connect the accused with the crime, but even though all those circumstances are compatible with defendant's culpability, they may also be compatible with any reasonable hypothesis of his innocence. All those present at the card game knew that the complainant's house was alone and that she was staying at her son's house. The stolen objects were never recovered, nor was it proved in any way whatsoever that the accused had them in his possession. Cf. *People* v. *Laureano,* 20 P.R.R. 7. This court has repeatedly held that it is not sufficient, in cases in which the only proof submitted is of indicative nature, that the circumstances established made probable the guilt of the accused, but rather, that such proof must be incompatible with any reasonable theory of innocence.

In every criminal case, where the only evidence submitted is of a circumstantial nature, in order to sustain a conviction said evidence, in being weighed, it must produce, as was said in the case of *Commonwealth* v. *Russ,* (Mass.) 122 N. E. 176, *"a moral certainty of guilt,* and to exclude any other reasonable hypothesis." In the evidence submitted in the instant case, there are some factors which tend to point to the defendant as the probable author of the larceny, but those factors do not produce moral certainty of his culpability. At the most they raise a suspicion against the accused, and it is well known that no one may be found guilty by mere suspicions, no matter how strong these may be. Cf. *State* v. *Johnson,* 293 N. W. 822.

The judgment appealed from must be reversed and the defendant acquitted.